J-S11007-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN WOODSON | : | |
| | : | |
| Appellant | : | No. 947 EDA 2022 |

Appeal from the PCRA Order Entered February 28, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001287-2015

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY OLSON, J.: **FILED JULY 13, 2023**

Appellant, Steven Woodson, appeals from the February 28, 2022 order entered in the Court of Common Pleas of Philadelphia County, denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541-9546. We affirm.

The PCRA court summarized the factual history as follows:

On January 1, 2015, [at] 10:37 a.m., [the victim, a woman,] went into the parking garage [located next to the intersection of North] 17th [Street] and Callowhill Street[ in the City of Philadelphia, Pennsylvania,] to retrieve her [vehicle]. She [] parked [in the parking garage] the previous night while celebrating New Year's Eve with some friends [] and [returned to the parking garage to retrieve her vehicle] so [] she could drive home [] that morning.

As [the victim exited] the parking garage's elevator on the sixth floor, she suddenly felt someone grab her from behind. A hand wrapped around her mouth, and a hard object[,] which felt like a gun[,] pressed into her lower back. [Appellant told the victim,] "Give me all of your money[."]

[The victim] tried to give her purse to [Appellant], but [he] said he wanted cash. [The victim] was fumbling through her wallet, frantically looking for money, when [Appellant] suddenly hit her. He struck her jaw hard and tried to snap her neck. As she begged for her life, "telling him that she had two small children, please don't kill me," [Appellant] closed his hands around her neck and choked her into unconsciousness[.]

When [the victim regained] consciousness, she could taste vomit and blood in her throat. She was lying on her stomach, on the ground between two [vehicles] in the parking garage[. The victim was] in so much pain from her twisted neck that she was afraid to check for other injuries. She turned her neck slightly and saw [Appellant] standing behind her, rummaging through her purse. When [Appellant] saw [the victim stand-up], he pushed her back between the cars and began screaming at her to [take] the battery out of her [cellular telephone], which [the victim] knew was impossible.

[Appellant] addressed [the victim] by her name. She asked how he knew her name, and he pointed to her [employer identification badge], which had fallen to the ground while he was going through her purse. [The victim] looked at [Appellant] "to see who he was, because his face was right here." When she looked at his face, however, [Appellant] became angry. He told her that he "was going to make sure she can't see," and then struck her repeatedly in the face with an orange key ring while she desperately tried to shield herself with her left hand. Again [the victim] began to lose consciousness; her awareness was "like an old [television] screen that would flash in and out."

Just then, a group of people [exited] the parking garage elevator and went to their [vehicles. Appellant] covered [the victim] with his black puffy coat and pretended to be making a [telephone] call on her [cellular telephone]. The people walked past without noticing [the victim] or her plight, and [the victim] realized at that point that she "was not going to leave that garage alive."

[The victim] tried to escape by trying desperately to crawl over the [parking] garage's cement barrier toward an exit stairwell, but [Appellant] dragged her back. He told her "to take off all her clothes, or he was going to try to kill her again." She said, "Please don't rape me," to which he replied that he would try to kill her if she did not remove her clothes.

Once [the victim] disrobed, [Appellant] turned her around so that he was behind her. [It was at this point that Appellant penetrated the victim with his fingers vaginally and anally. The victim then] heard [Appellant] unbuckle his belt and [she] began "looking all around for cars, flashes of lights, anything to escape at this point because she knew [Appellant] was going to rape and kill her." Shortly after she heard [Appellant] unfasten his belt buckle, she felt his penis press painfully into her anus.

Just then, [the victim] glimpsed headlights and heard a [vehicle] coming around the corner. She "knew that her only chance, if this was a [vehicle], was to throw [her]self in front of it and risk [that the vehicle would not stop in time before hitting her.]" She sprinted away from [Appellant] as quickly as she could. Naked and wounded, [the victim] threw herself in [the travel path] of the [vehicle], screaming, "he tried to rape me, that man tried to kill me and rape me."

[A husband and wife] were in that [vehicle]. They had driven [] from New Jersey that morning to take [the husband's] mother out for a New Year's Day brunch. As they pulled into the parking garage, they were startled to see a naked, injured woman hurl herself in front of their [vehicle], screaming, "Please help me, he's going to kill me."

Both [the husband and the wife] got out of their [vehicle] and put [the victim] inside [the vehicle]. They saw [Appellant] "emerge, sort of, from behind the cars" and look directly at them. [Appellant] took off running, so [the husband] chased him, while [the wife] retrieved a fleece jacket and a blanket from the back of their [vehicle] to wrap around [the victim], as it was a very cold day and [the victim was naked]. After tending to the victim, the wife] called 911 [emergency services].

[Meanwhile, the husband] chased [Appellant] out of the parking garage and up [North] 17th Street. As [Appellant] ran, he started "cursing at [the husband], telling [the husband] to stay away from him or he'd hurt him." During the pursuit, [the husband] was on [his cellular telephone] with a 911 dispatcher, and had the opportunity to observe[, and report,] that [Appellant] was wearing "a dark blue or black three-quarter-length jacket [] and a hat with a distinctive, about three-quarter-inch [wide], yellow stripe around the band." [The husband] chased [Appellant] into a walled parking lot near Philadelphia Community College [("PCC")], but stopped [before entering the parking lot] because [the husband]

- 3 -

did not want to be alone with a violent individual away from public view.

Officer Frank Binns [("Officer Binns")] was on duty [at] 10:45 [a.m.] that morning when he received a [radio dispatch] call of a rape in progress. The flash information transmitted over police radio indicated that the suspect was a "black male, black jacket, black hat with a yellow stripe, blue jeans and white sneakers, leaving a garage at [the intersection of North] 17th [Street] and Callowhill [Street] heading north on [North] 17th Street." Moments after receiving this information, Officer Binns observed [Appellant] walking northbound on [North] 17th Street. [Appellant] was wearing blue jeans and white sneakers, but had no coat and no hat on, [despite the fact that] it was a very cold day. Officer Binns [stopped his police cruiser] and asked [Appellant] where his coat was, and what his name was. [Appellant provided Officer Binns with] several names, all of which proved to be false. Meanwhile, [a] police radio broadcast [provided] additional information that the suspect had a scruffy beard. [Appellant] had such a beard.

Officer Erick Garnett [("Officer Garnett")], along with other police officers, searched the area of [North] 17th [Street] and Callowhill Street[] for possible evidence. In the PCC parking lot on the 400 block of [North 17th] Street - the same parking lot where [the husband] stopped his pursuit of [Appellant] moments earlier - Officer Garnett found a black puffy jacket, an "orange/reddish" keychain, and a black hat with a yellow stripe.

Officer Binns stopped [Appellant] until police brought [the husband] over to identify him. It was only "a couple of minutes tops, maybe a minute" from the time that [the husband] chased [Appellant] into the PCC parking lot until police asked [the husband] whether he could identify [Appellant] as the man he [] chased. [The husband] replied that he "thought so, but he couldn't be sure because the hat wasn't right and there was no jacket." However, when police showed him the puffy jacket and yellow-striped black hat that they [] recovered from the ground, [the husband] was "100 percent sure" that those articles had been worn by the man he was chasing.

Officer Anthony Lazzaro [("Officer Lazzaro")] also responded to the call of a rape in progress. Upon arriving at the scene, Officer Lazzaro encountered [the victim], who was "extremely distraught. She was crying, she was shaking, she had cuts and scratches and

red marks all over her body. She was very afraid." Officer Lazzaro sat in the back of his police [cruiser] with [the victim] and tried to calm her down enough to get an initial statement from her, which "took a few minutes, probably a little longer because she was very upset, she was crying, she was just very scared." However, [the victim] eventually was able to give a brief account of the attack and a description of her attacker. Officer Lazzaro told her that other police officers [] stopped a suspect and asked her whether she would be able to make an identification. In response, [the victim] "looked down and it was just a look of fear that went over her, and she said that she didn't want to see him. We drove over to the area, and I was sitting next to her. As soon as we got even close to the area, she latched onto my uniform, and she wouldn't even - she wouldn't look up. I explained to her that that was the male who was stopped as the possible offender of this crime. She just sobbed, and she was afraid to even lift her head and look. She gave a quick glance, and she was just crying, there was no way I was going to get her to make an identification one way or the other out there. She was just afraid."

Sergeant Thomas Reichner of the Philadelphia K9 Unit [("Sergeant Reichner")] was in the area of [North] 17th [Street] and Callowhill Street[] when the police radio call went out. [Sergeant] Reichner went to the parking garage and asked his [K9], Koda, to begin tracking the suspect from the site of the attack. Koda followed the track down the steps where [the husband] chased the fleeing suspect, took a left on Callowhill [Street] to [North] 17th Street, and continued northbound on [North] 17th Street to the PCC parking lot. There, Koda bit a black puffy jacket and a black hat with a yellow stripe on it, signaling that these items had been worn by the person he was tracking. These were the same two articles that Officer Garnett [] flagged as potentially belonging to the suspect, and that [the husband] said he was "100 percent sure" that the suspect had worn. Koda also bit a sweatshirt lying on the ground near the other two articles. Koda continued to track the suspect's trail from the discarded clothing toward the area where [Appellant] was standing after having been stopped by police. As they neared [Appellant, Sergeant] Reichner terminated the track, because Koda's reward for successfully completing a track "is to bite," and [Sergeant] Reichner "didn't want him biting someone who is already in custody."

Based on the totality of these circumstances, Officer Binns decided to transport [Appellant] to the 9th District [police precinct] for identification.[FN2] Before transporting [Appellant], Officer Binns

searched him and found various items including two credit [or] debit cards with different names on them. [Appellant] was not carrying any other contraband or weapons. One of the debit cards in his possession had [the victim's] name on the front and signature on the back.

> [Footnote 2: Upon ascertaining [Appellant's] real name, police [officers] determined that he had an outstanding warrant in Pittsburgh[, Pennsylvania,] for indecent exposure, and placed him under arrest.]

Police [officers] found other evidence, including a torn-out clump of [the victim's] hair, a broken [cellular telephone], and [the victim's] discarded purse, in the parking garage where [the victim] was attacked.

On February 3, 2015, [the victim] attended a [police] line-up. Before entering the room where the line-up was to be conducted, or seeing anyone in it, she filled out a written description form that noted that her assailant had "a scar near the right eyebrow." [Appellant] did, in fact, have a scar above his right eye. After [the victim] filled out the form, she went into the line[-]up room. Despite the fact that she was "crying heavily as she entered and during the entire line[-]up process," she was able to immediately identify [Appellant] as her attacker. Her identification was so swift and certain that Detective Bill Urban, who was conducting the line[-]up, "didn't even have to move the people" by asking any of them to step forward or turn to the side, as he ordinarily would.

[The] police obtained a search warrant for [Appellant's cellular telephone]. The only relevant material on that [telephone] was a December 4, 2014 [photograph] of [Appellant] wearing the black puffy jacket that was recovered from the PCC parking lot on the day of the attack.

Bloodstained fabric samples from the black puffy jacket and sweatshirt recovered from the PCC parking lot were submitted for [Deoxyribonucleic acid ("DNA")] analysis, which confirmed that the blood on that clothing [belonged to the victim]. The DNA analysis was also consistent with [Appellant] having worn the items. This forensic evidence corroborated [the victim's] account of [Appellant] hiding her from passersby by covering her with his jacket while she was bleeding.

[The victim] was given a rape kit at [the hospital], where medical professionals also documented her extensive injuries. None of the

- 6 -

swabs taken from [the victim's] body showed DNA belonging to any individual other than [the victim]. A skin swab from [Appellant's hand] returned only his own DNA, with no DNA from any other individual detected. However, both the forensic scientist who analyzed the DNA and the doctor who conducted the rape kit testified that, in the "vast majority of the cases," only the primary individual's DNA was recovered from such samples, and that this result was "not surprising."

[Appellant] testified on his own behalf at trial. He testified that he had been out all night at a private party with a friend named "Taz," whose real name he declined to provide. According to [Appellant], Taz opted to sleep in his car outside [Appellant's] grandfather's house [on the night prior to the attack], so [Appellant] lent Taz his black puffy jacket and yellow-striped black hat because it was a cold night. The next morning, Taz offered to drive [Appellant] to visit his other grandfather[, who was] in the hospital. On the way to the hospital, Taz told [Appellant], "hold on, listen, I need to do something real quick," and stopped outside the parking garage [where the attack occurred]. After Taz went into the parking garage, [Appellant] "heard some yelling" and went to investigate.

At that point, [Appellant] testified, he saw "a lady laid out flat on the ground," with Taz brandishing a gun above her. [Appellant] testified that he had a "tussle" with Taz, in the course of which he managed to remove the bullets from Taz's gun and put them in his pocket for safekeeping. He then walked away from the altercation.

[Appellant] admitted that he had not mentioned Taz or his rescue of [the victim], when he was interviewed by police shortly after his arrest. Instead, he said that he had gotten lost on his way to the hospital and was trying to visit his grandfather when he was stopped by Officer Binns on [North] 17th Street.

Mr. Woodson acknowledged his history of *crimen falsi* offenses.

PCRA Court Opinion, 7/18/22, at 3-10 (original brackets, extraneous capitalization, and ellipses omitted).

The PCRA court summarized the procedural history as follows:

On March 9, 2017, following a trial by jury, [Appellant] was found guilty of attempted rape, aggravated assault, involuntary deviate sexual intercourse [("IDSI") – forcible compulsion], robbery, sexual assault, and aggravated indecent assault without consent.[1]  On June 15, 2017, [Appellant] was sentenced to an aggregate period of [40] to [80] years of state incarceration. [Appellant] was designated a sexually violent predator.

[Appellant] filed a post-sentence motion, which was denied. [Appellant] filed a timely appeal to [this Court], which affirmed the judgment of [] sentence on January 10, 2019. **Commonwealth v. Woodson**, [209 A.3d 491, 2019 WL 156544 (Pa. Super. filed Jan. 10, 2019) (unpublished memorandum). Appellant] filed a timely petition for allowance of appeal [with our Supreme Court] on February 8, 2019, which was denied on July 23, 2019.  [**Commonwealth v. Woodson**, 216 A.3d 1024 (Pa. 2019).  Appellant did not seek discretionary review with the Supreme Court of the United States.  Consequently, Appellant's judgment of sentence became final on October 21, 2019, upon expiration of the time in which to seek discretionary review with the Supreme Court of the United States.  **See** U.S. Sup. Ct. R. 13(1); **see also** 42 Pa.C.S.A. § 9545(b)(3).

Appellant] filed a timely [PCRA] petition for [collateral] relief on June 23, 2020.  [On] January 3, 2022, the parties were given notice of [the PCRA] court's intent to dismiss the PCRA Petition without a hearing pursuant to [Pennsylvania Rule of Criminal Procedure] 907.  [Appellant did not file a] response to the [Rule 907] notice[.  On] February 28, 2022, the PCRA [court denied the] petition[.]

PCRA Court Opinion, 7/18/22, at 1-2 (extraneous capitalization and original footnote omitted).  This appeal followed.[2]

Appellant raises the following issues for our review:

_____

[1]  18  Pa.C.S.A.  §§ 901(a)  (and  3121(a)(1)),  2702(a),  3123(a)(1), 3701(a)(1)(iii), 3124.1, and 3125(a)(1), respectively.

[2] Both Appellant and the PCRA court complied with Pennsylvania Rule of Appellate Procedure 1925.

- 8 -

1.  Whether the PCRA court erred by dismissing the PCRA petition when clear and convincing evidence was presented that trial counsel was ineffective for failing to subpoena and present [Appellant's cellular telephone] records, adequately cross-examine the DNA expert, prove the fabrication of evidence by the arresting [police] officer, and protect [Appellant's] constitutional rights[?]

2.  Whether the PCRA court erred by dismissing the PCRA petition when clear and convincing evidence was presented that appellate counsel was ineffective for failing to raise and preserve [Appellant's] requested claim on appeal, thereby constituting a complete foreclosure of appellate review[?]

3.  Whether the PCRA court erred by dismissing the PCRA petition when clear and convincing evidence was presented to establish violations of [Appellant's] constitutional rights; including an unlawful search and seizure under both the United States and Pennsylvania constitutions, violations of his due process rights based on several instances of prosecutorial misconduct, as well [as] the right to effective representation at trial and on appeal[?]

4.  Whether the PCRA court erred by failing to grant an evidentiary hearing[?]

Appellant's Brief at 9.[3]

In addressing Appellant's issues, we are mindful of our well-settled standard and scope of review of an order denying a PCRA petition. Proper appellate review of a PCRA court's dismissal of a petition is limited to an examination of "whether the PCRA court's determination is supported by the

_____

[3] We note that Appellant's brief fails to conform to Pennsylvania Rule of Appellate Procedure 2135(c), which requires the size and other physical characteristics of a brief to comply with Pennsylvania Rule of Appellate Procedure 124. Pa.R.A.P. 2135(c). Rule 124 requires, *inter alia*, text to be double spaced. Pa.R.A.P. 124. The text appearing in Appellant's brief is not double spaced. **See** Appellant's Brief at 6-25.

record and free of legal error." ***Commonwealth v. Miller***, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." ***Commonwealth v. Lawson***, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." ***Commonwealth v. Hickman***, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted). In contrast, we review the PCRA court's legal conclusions *de novo*. ***Commonwealth v. Henkel***, 90 A.3d 16, 20 (Pa. Super. 2014) (*en banc*), *appeal denied*, 101 A.3d 785 (Pa. 2014).

Appellant's first issue raises a claim alleging that trial counsel provided ineffective assistance. Appellant's Brief at 14-19. Specifically, Appellant alleges that trial counsel was ineffective for failing to (1) subpoena, and present at trial, Appellant's cellular telephone records; (2) adequately cross-examine the Commonwealth's DNA expert, who testified at trial; (3) establish, at trial, that the arresting officer fabricated evidence; and (4) protect his constitutional rights, including his right against unlawful searches and seizures, his due process rights, and the right to effective counsel. ***Id.***

"It is well-established that counsel is presumed effective[.]" ***Commonwealth v. Koehler***, 36 A.3d 121, 132 (Pa. 2012), *citing **Strickland v. Washington***, 466 U.S. 668, 687-691 (1984). To plead and prove a claim of ineffective assistance of counsel, "a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an

objective[ly] reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." ***Commonwealth v. Stewart***, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*), *appeal denied*, 93 A.3d 463 (Pa. 2014). "A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs." ***Commonwealth v. Martin***, 5 A.3d 177, 183 (Pa. 2010). "In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued[. R]ather, we must examine whether counsel's decision[] had any reasonable basis." ***Commonwealth v. Washington***, 927 A.2d 586, 594 (Pa. 2007). A petitioner establishes prejudice when he or she demonstrates "that there is a reasonable probability that, but for counsel's [acts or omissions], the result of the proceeding would have been different." ***Commonwealth v. Johnson***, 966 A.2d 523, 533 (Pa. 2009).

Here, Appellant asserts that trial counsel was ineffective for failing to subpoena his cellular telephone records from his cellular service provider and present those records as exculpatory evidence at trial. Appellant's Brief at 15. Appellant asserts that the records detailed communication between Appellant and a third party *via* textual messaging at the time of the attack. ***Id.*** Appellant contends that he described what he observed at the time of the attack in text messages sent to a third party. ***Id.*** Appellant avers that his communications with the third party would have demonstrated that "another male, 'Taz,' was in the midst of engaging in the criminal assault upon the

[victim] and was the true perpetrator of the crime for which [Appellant] was [convicted]."[4] *Id.*

In denying Appellant's ineffectiveness claim on this ground, the PCRA court explained,

> [Appellant] provided no evidence of the text messages presumed to show a contemporaneous conversation between [Appellant] and a third-party not present at the scene [in] which [Appellant] described his observations during the attack. The evidence is directly contradicted by [Appellant's] testimony at trial, during which [Appellant] claimed he was entirely unaware of the attack until he "heard some yelling" and went into the parking garage to investigate. Counsel cannot be ineffective for failing to argue incompatible scenarios.
>
> Additionally, the police examined [Appellant's cellular telephone]. They found no relevant material other than a photograph of [Appellant] wearing the same-style jacket that was recovered from the PCC parking lot with the victim's blood on it.

PCRA Court Opinion, 7/18/22, at 12 (citations omitted).

A review of the record demonstrates that Appellant asserted in a supplemental amended PCRA petition that trial counsel was ineffective for failing "to subpoena and present [Appellant's cellular telephone] records."

---

[4] At trial, Appellant testified that "Taz" was the name of a male he associated with on New Year's Eve, and that at the end of the evening, Taz provided Appellant a ride to the apartment where Appellant was spending the night. N.T., 3/7/17, at 82-84. Taz agreed to provide Appellant with a ride the following day to visit a relative in the hospital. *Id.* at 84. Appellant further testified that Taz slept overnight in a vehicle he owned which was parked in front of the apartment building where Appellant changed his clothes, brushed his teeth, and "recharge[d] for a little bit." *Id.* at 84-86. Appellant alleges he gave Taz the black jacket and hat with the yellow strip that were later recovered from the PCC parking lot because the temperature outside was cold, and Taz was sleeping overnight in his vehicle. *Id.* at 85.

Supplemental Amended PCRA Petition, 9/14/21, at ¶6. Appellant further asserted that he "presented trial counsel with his [cellular telephone] number and carrier information, and requested that [trial] counsel subpoena the records, specifically the text communications between [Appellant] and [the third party]." Memorandum of Law in Support of Supplemental Amended PCRA Petition, 9/14/21, at 4 (unpaginated). Despite the passage of more than three years since his conviction at trial, Appellant did not attach a transcript of the cellular telephone text messages to his petition.

Pennsylvania Rule of Criminal Procedure 902(D) requires a petitioner to "attach to the petition any affidavits, records, documents, or other evidence which show the facts stated in support of the grounds for relief, or the petition shall state why they are not attached." Pa.R.Crim.P. 902(D); *see also Commonwealth v. Carson*, 913 A.2d 220, 251 (Pa. 2006) (stating that, a PCRA petition is required "to attach supporting documentary evidence for [the] claims or an explanation as to why such evidence was unavailable"). The filing of a PCRA petition and a request for an evidentiary hearing "is not meant to function as a fishing expedition for any possible evidence that may support some speculative claim of ineffectiveness." *Commonwealth v. Roney*, 79 A.3d 595, 605 (Pa. 2013). In the case *sub judice*, Appellant did not attach to his PCRA petition evidence in support of his claim, *i.e.*, a transcript of his cellular telephone text messages with a third-party at the time of the attack or an affidavit from the third-party who allegedly received the text messages. Moreover, Appellant never explained in his petition why such

evidence was unavailable. *See* Supplemental Amended PCRA Petition, 9/14/21; *see also* PCRA Court Opinion, 7/18/22, at 12. As such, we concur with the PCRA court that this aspect of Appellant's ineffectiveness claim is without arguable merit. PCRA Court Opinion, 7/18/22, at 12.[5]

_____

[5] Moreover, we concur with the PCRA court that Appellant's allegations regarding communications allegedly sent while the attack occurred conflicted with Appellant's testimony at trial. At trial, Appellant testified as follows regarding events prior to the attack, during the attack, and after the attack:

> [Prior to the attack on the victim,] as [Taz is] driving he tells me hold on, listen, I need to go do something real quick, wait outside for me. So, I'm like all right. Me, knowing how we do or how I used to be - well, put it this way, me knowing my homies, I knew not to ask questions. If he wanted to tell me, he would've told me. So, if he didn't, he didn't. I didn't know exactly what he was doing. I thought that he might be going to pick up something or whatever he was doing.
>
> So, I just went outside, and he pulled up - let me see, he pulled up, I went outside, I stood outside the garage that unfortunately the situation happened in. He went in. I'm talking on my [cellular telephone], smoking a cigarette, texting off and on, and he don't show up again, so I'm like what's up.
>
> I hear some yelling, I go upstairs, about to go up, you know, inside the stairwell inside the parking garage, [because] you can see on both sides of the parking garage if you look in, and I really don't see anything, but, you know, I'm hearing.
>
> I go over to see what's up with my homie, and there's a lady laid out flat on the ground. I'm like, yo, dude, seriously though. He's like - he's like, damn, dog, I told you hold on man. So, me and - like, he's grabbing her, I'm tussl[ing] with him a little bit, I [] take - yeah, he did have a gun. I emptied them joints [(bullets)] out, I'm like, listen, I'm gone, you trippin, I'm be - I'm out. So, I go outside.

- 14 -

Next, Appellant asserts that trial counsel was ineffective for failing to adequately cross-examine the Commonwealth's DNA expert. Appellant's Brief at 16. Appellant contends that,

> The DNA expert's report established that there was no evidence of [the victim's] vaginal fluid on [Appellant's] hands or body. Additionally, there was no evidence of [Appellant's] DNA on the [victim's] body. However, trial counsel failed to question the [expert] witness about this issue and elicit testimony to establish that the lack of DNA evidence is strongly indicative of [Appellant's] innocence.

*Id.*

In determining that Appellant failed to demonstrate the prejudice prong of the three-part ineffectiveness test, the PCRA court explained,

> [Appellant] claims [trial counsel was] ineffective[] for failing to question the [Commonwealth's] DNA expert witness about the lack of [Appellant's] DNA on the [victim's] body. Additionally, [Appellant] claims that [trial] counsel was ineffective [for failing to elicit] testimony from the witnesses that the lack of DNA evidence is strongly indicative of innocence. Trial counsel was

_____

> Now, **I'm on the [telephone] leaving a message** now like yo, like, dude trippin, like ah, ah, ah, man, I'm about to get locked up, ya'll know I'm gonna run already, like this is crazy. Next thing you know, [Taz] flies passed me and then another dude flies passed me. Now I'm like damn, I'm gonna have to go - like, that's my homie, I'm not approving [of] what he did, but like we - we have a right or wrong, good or bad, that's my man. So, I'll stay around to see what was up. I sit around and I see [Taz], he dips off to the side. I see the dude peeking, and then he comes back, and that's when I start walking down - down the street.

N.T., 3/7/17, at 88-89 (emphasis added). Trial counsel cannot be ineffective for failing to present evidence at trial that directly contradicts Appellant's own testimony of the events.

- 15 -

unable to elicit that testimony specifically because the [Commonwealth] witnesses both indicated that the absence of such evidence was not indicative of innocence and was, in fact, quite common in sexual assault cases. [Appellant's] trial counsel also called an expert witness for the defense who testified [that,] in his opinion, one would expect to find the victim's DNA on [Appellant's] hands if the assault had occurred as described [by the victim.]

PCRA Court Opinion, 7/18/22, at 13.

The record demonstrates that Lynn Haimowitz testified on behalf of the Commonwealth as an expert in the field of forensic science and DNA analysis. N.T., 3/2/17, at 143. Haimowitz testified that the swabs collected from various parts of the victim's body, which comprised the "rape kit," showed the presence of only the victim's DNA.[6] *Id.* at 150, 179-180. Haimowitz further testified that the swabs collected from Appellant's hands showed the presence of only his DNA. *Id.* at 150-151; 178. When presented with the hypothetical, "if I touch your hand with my hand and then someone down the road swabs your hand and then you test it to see if my DNA shows up on your hand, are you surprised if [my DNA] doesn't [show up]?," Haimowitz responded that she would not be surprised that the DNA of the person touching her hand would not appear in an analysis of a swab sample taken from her hand. *Id.* at 151. Haimowitz explained,

when they're swabbing someone's hands, there's obviously going to be a lot of DNA from the person whose hand it is. You're going

---

[6] The swabs that comprised the "rape kit" consisted for swabs from the right side of the victim's neck, from the left side of the victim's neck, a rectal swab, a perianal swab, a vulvar swab, and a vaginal swab. N.T., 3/2/17, at 179.

to have - most of what you're picking up from that swab is going to be skin cells of the hand. If there is any DNA from another person, chances are there's much less of it present than the person whose hand it is. And because of that, it's probably not going to be detected with the processes we use. It's also depending on how much contact there was with that hand. We don't know how much DNA they left behind to begin with. So, if it was a small amount of DNA to begin with and then some time passed, it's not surprising that you can't get DNA from that second individual.

*Id.* (paragraph formatting omitted). On cross-examination, Haimowitz confirmed, through a series of questions posed by Appellant's trial counsel, that the analysis of the swabs collected from the victim showed the presence of only the victim's DNA and no additional individuals, and the analysis of the swabs collected from Appellant's hands showed the presence of only Appellant's DNA, and no additional individuals. *Id.* at 180.

During Appellant's case-in-chief, Arthur Young testified as an expert in the field of identification of biological elements, DNA analysis, and biological forensic sciences. N.T., 3/7/17, at 132. Young agreed with Haimowitz's conclusions that the DNA discovered on the swab samples from the victim was consistent with originating from the victim and that the DNA discovered on the swab samples of Appellant's hands was consistent with originating from Appellant. *Id.* at 134-135. Young stated that he would expect to find the presence of Appellant's DNA on the swab samples from the victim if Appellant penetrated the victim vaginally with his hand, and similarly, he would expect to find the victim's DNA on the swab sample taken from Appellant's hand. *Id.* at 135-136. When asked to explain his statement, Young stated,

modern DNA analysis is extremely sensitive. If you were to give me a drop of blood the size of a period, I could get you a DNA profile and give you back about three quarters of that blood stain as change. That's how little I need.

However, not all biological fluids are rich in DNA. If you gave me a sweat stain the size of a period, I probably could not get DNA out of that because most of sweat is just water. There's very little cells, and therefore very little DNA in that.

Saliva is fairly rich. I would need about half of that stain. Vaginal fluid, however is extremely rich. It's extremely rich in DNA. So, about the same level as blood. So, I wouldn't need a whole lot of sample in order to get a DNA profile. And if a finger had been inserted into [the victim's] vagina, I would expect that somewhere that DNA would have shown up.

In addition, we're talking about the laboratory having detected [Appellant's] DNA off of his own hand. Now, he may have his own DNA on his hand, for example if he coughs or sneezes and blocks it with his [hand] that would put his DNA on his hand, but his hand is also comprised of cells which have his DNA.

So, if there was something on it, and especially if it was bodily fluid like a vaginal fluid of somebody else, if you could get [Appellant's] DNA from his fingers, you should be able to get anything that was on top of his hand just by the simple act of swabbing, and there was no such thing.

*Id.*

Upon review, we concur with the PCRA court that Appellant failed to demonstrate how he was prejudiced by trial counsel's performance. PCRA Court Opinion, 7/18/22, at 13. Trial Counsel elicited testimony from the Commonwealth's DNA expert that Appellant's DNA was not discovered in an analysis of the swabs taken from the victim and that the victim's DNA was not discovered in an analysis of the swabs taken from Appellant's hands. N.T., 3/2/17, at 180. Appellant's own expert witness testified that, in his opinion,

if the events of the assault occurred as described by the victim, *i.e.* if Appellant penetrated the victim vaginally with his finger, the victim's DNA should have been detected in an analysis of the swabs taken from Appellant's hands because vaginal fluid is "extremely rich" in the presence of DNA. N.T, 3/7/17, at 135-136. As such, we find no abuse of discretion or error of law in the PCRA court's dismissal of Appellant's petition on this ground.

Appellant next asserts that trial counsel was ineffective for failing to prove the fabrication of evidence by Officer Binns and Detective Brian Meissler ("Detective Meissler"). Appellant's Brief at 17. Appellant asserts that the two police officers fabricated a police report and property receipt form showing that the victim's credit card had been discovered on Appellant's person at the time of his arrest. *Id.* Appellant argues,

> All standard police reports and documentation in this case support [Appellant's] assertion that the credit cards [discovered on his person and admitted at trial] were not recovered from him at the time of his arrest. The initial 75-48A report indicates that nothing was recovered from [Appellant]. All of [Appellant's] personal items were photographed, inventoried[,] and placed on a property receipt [form] at the time of his arrest. The credit cards were not included in the 75-48A [report]. No photographic evidence of the [credit] cards was included in the documentation of [Appellant's] personal items or in the property receipts for the personal items of [Appellant]. The arresting [police] officer generated a property receipt subsequent to [Appellant's] arrest, which was not properly witnessed by another [police] officer and a proper chain of custody was never established.

*Id.*

In denying Appellant's petition on this ground, the PCRA court stated,

[Appellant] failed to provide evidence of police fabrication of the [victim's] credit cards in [Appellant's] personal possessions, which had been put in a police evidence bag after his arrest. [Appellant] relies on a lack of inclusion of the [victim's credit] cards on the initial [75-48A report] and lack of a property receipt for [credit] cards or any other items found on [Appellant] by Officer Binns.

Officer Binns and Detective Meissler were extensively cross-examined on the failure to include the [victim's credit] card on the initial property paperwork. Furthermore, the [victim] testified that she specifically offered that [credit] card to [Appellant] because she knew it was unusable. Finally, the [victim] identified the [credit] card in a police evidence envelope and testified that detectives showed her the same [credit] card while she was being treated at [the hospital. Appellant] has not demonstrated that [his] fabricated evidence claim has any underlying merit.

Additionally, [Appellant] has not shown that trial counsel made an unreasonable strategic decision in pursuing a suppression motion on Fourth Amendment grounds, then arguing the credibility of that evidence, both during cross-examination and closing [arguments].

PCRA Court Opinion, 7/18/22, at 13-14.

The record demonstrates that in the 75-84A report prepared by Officer Binns after the events on January 1, 2015, he noted that during a pat-down of Appellant's person he discovered two credit cards in the front right pocket of Appellant's pants. N.T., 3/6/17, at 31, 51. Each credit card contained a different name, and neither name was the name provided by Appellant. *Id.* at 31. At this point, Officer Binns was unaware of the victim's name. *Id.* at 32. Officer Binns stated that the credit cards were later provided to another police officer at the police precinct. *Id.* at 35. On cross-examination, Officer Binns acknowledged that, in statements provided to the investigating officer from the special victims unit, he reported that two credit cards had been

recovered from Appellant's person but that his partner reported nothing had been discovered on Appellant's person. *Id.* at 48. When asked about the differing statements made to the investigating officer regarding the credit cards, Officer Binns explained that he, and not his partner, was the police officer who performed the pat-down of Appellant's person. *Id.* at 50.

Detective Meissler testified that he was the police officer responsible for inventorying Appellant's belongings once the items arrived at the police precinct. N.T., 3/7/17, at 11. Detective Meissler stated that Appellant's items, including the two credit cards, arrived at the precinct in a police property bag. *Id.* at 12. One of the credit cards inventoried by Detective Meissler was a temporary credit card bearing the victim's signature on the back of the credit card. *Id.* at 13. On cross-examination, Detective Meissler acknowledged that, unlike the property receipts used to inventory Appellant's other belongings, the property receipt used to inventory the victim's credit card did not contain the signature of another police officer who witnessed Detective Meissler's inventorying of the credit card. *Id.* at 26. Detective Meissler further acknowledged on cross-examination that while several photographs were introduced showing the various items that he inventoried as discovered on Appellant's person, he was unable to locate a photograph depicting the credit card at the time it was inventoried.

Upon review, we concur with the PCRA court that Appellant's ineffectiveness claim based on trial counsel's failure to demonstrate that the police officers fabricated evidence of the victim's credit card being discovered

on Appellant's person is without merit. Trial counsel cross-examined both Officer Binns and Detective Meissler extensively about the inconsistencies and discrepancies in the collection and recording of the victim's credit card recovered from Appellant's person. Absent an admission by one of the police officers that the evidence was fabricated, which trial counsel was unlikely to obtain, trial counsel reasonably challenged the veracity of the evidence on cross-examination. It was within the purview of the jury to weigh this evidence and assign credibility to it. As such, we discern no abuse of discretion or error of law in the PCRA court's dismissal of Appellant's petition on this ground.

Finally, Appellant asserts that trial counsel was ineffective for failing to "protect [his] constitutional rights." Appellant's Brief at 14. A review of Appellant's supplemental amended PCRA petition appears to raise a claim for collateral relief pursuant to Section 9543(a)(2)(ii) (ineffective assistance of counsel) on the ground that he "was denied effective assistance of counsel at trial [] as guaranteed by the Sixth Amendment of the United States Constitution and the analogous provisions of the Pennsylvania Constitution." Supplemental Amended PCRA Petition, 9/14/21, at ¶6. It is well-established that a defendant enjoys a constitutional right to effective assistance of counsel. *See Commonwealth v. Washington*, 880 A.2d 536, 578 (Pa. 2005); *see also Pierce*, 527 A.2d 973, 979 (Pa. 1987) (Nix, C.J. concurrence) (stating, "[t]he right to assistance of competent counsel at trial as recognized at this time, in this Commonwealth, is a critical element of the panoply of

rights encompassed in the concept of a fair trial"). As Appellant failed to establish that trial counsel was ineffective as discussed *supra*, we discern no abuse of discretion or error of law in the PCRA court's dismissal of this claim.

In his second issue, Appellant challenges the PCRA court's dismissal of his petition on the ground that direct appeal counsel was ineffective for failing to raise a requested claim. Appellant's Brief at 19-21. Appellant contends that he asked direct appeal counsel to "include the claim relating to the introduction of fabricated evidence."[7] *Id.* at 20.

Appellant's instant claim alleges that appellate counsel was ineffective for failing to raise, on direct appeal, a claim that trial counsel was ineffective for failing to object to the introduction of the fabricated evidence.[8] It is well-settled that claims of trial counsel's ineffectiveness are to be raised in

---

[7] Although Appellant does not specifically identify the "fabricated evidence" in his appellate brief, we presume, based upon the argument in support of his first issue therein, that "fabricated evidence" refers to Appellant's allegations pertaining to the victim's credit card. *See* Appellant's Brief at 17 (discussing "fabricated evidence" as the evidence of the victim's credit card being found on Appellant's person at the time of arrest). Moreover, it is unclear from a review of Appellant's brief in support of his second issue, what specific challenge relating to the fabricated evidence Appellant asked counsel to raise on direct appeal. *Id.* at 20 (stating, "the [appellate] brief [filed on direct appeal] did not include the claim relating to the introduction of fabricated evidence"). Based upon a reading of Appellant's argument in support of his first issue, however, Appellant's challenge to the performance of direct appeal counsel appears to center upon "trial counsel's failure to object to the introduction of the [victim's] credit cards as evidence at trial[.]" *Id.* at 17.

[8] Appellant contends, and the record supports, that trial counsel did not object, at trial, to the introduction of evidence involving the victim's credit card.

collateral proceedings and may not be raised on direct appeal. ***Commonwealth v. Bradley***, 261 A.3d 381, 391 (Pa. 2021); ***see also*** 42 Pa.C.S.A. § 9543(a)(2)(ii). As such, direct appeal counsel cannot be ineffective for failing to raise, prematurely, a claim on direct appeal that is properly reserved for collateral proceedings. Moreover, we note that trial counsel and direct appeal counsel were the same attorney. An attorney cannot raise a claim involving his or her own ineffectiveness. ***Commonwealth v. Basemore***, 744 A.2d 717, 726 (Pa. 2000) (stating that, "as a general rule, counsel cannot raise his[, or her,] own ineffectiveness").

To the extent, however, that Appellant asserts a claim challenging the effectiveness of trial counsel for failing to object to the introduction of the victim's credit card as evidence at trial, we find this issue to be without merit. We concur with the PCRA court that, as part of his instant petition, Appellant failed to establish that the evidence, namely the 75-48A form and the property receipt, were fabricated by Officer Binns and Detective Meissler. Rather, Appellant relied on mere assertions that Officer Binns fabricated the 75-48A form because Officer Binns' partner stated that no items were recovered from Appellant whereas Officer Binns reported on the 75-48A form that the victim's credit card was discovered on Appellant's person. Appellant speculates that Detective Meissler fabricated the property receipt showing that the victim's credit card was discovered on Appellant's person because the property receipt did not contain a witness signature. Therefore, Appellant failed to demonstrate that the underlying claim – that the property receipt was

fabricated - was meritorious. As such, trial counsel cannot be deemed ineffective for failing to lodge a meritless objection. Instead, absent direct proof that the evidence was fabricated, trial counsel pursued a line of questioning on cross-examination that raised questions as to the veracity of the evidence based upon the idea that the evidence was fabricated in order to discredit the evidence in the eyes of the jury, as fact-finder. Consequently, we find Appellant's claim that trial counsel was ineffective for failing to lodge an objection to the alleged fabricated evidence to be without merit.[9]

In his third issue, Appellant asserts that the PCRA court erred in denying his request for collateral relief on the ground that "violations of his due process constitutional rights [] so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Appellant's Brief at 21-23; *see also* 42 Pa.C.S.A. § 9543(a)(2)(i). Appellant argues that the Commonwealth's introduction of fabricated evidence, *i.e.* the victim's credit card, and the use of perjured testimony from the victim constituted prosecutorial misconduct and violated his due process rights.[10] Appellant's

_____

[9] Insofar as Appellant asserts that he was denied "a complete foreclosure of appellate review," we find this assertion to be of no avail. Appellant was afforded direct review by this Court. *See Woodson*, 209 A.3d 491, 2019 WL 156544.

[10] To the extend Appellant asserts that his constitutional rights were violated because trial counsel failed to provide effective representation, we find this assertion to be without merit for the reasons discussed *supra* regarding Appellant's claims of ineffective assistance of trial counsel.

Brief at 22. Appellant contends that his due process rights were violated because the Commonwealth knowingly allowed materially false testimony and evidence to stand uncorrected. *Id.*

As discussed *supra*, Appellant failed to demonstrate that the evidence of the victim's credit card being found on Appellant's person was fabricated. *See* Pa.R.Crim.P. 902(D); *see also Carson*, 913 A.2d at 251. Regarding the allegation that the victim perjured her testimony (*see* Appellant's Brief at 22), Appellant fails to develop an argument to support his assertion, including citation to the specific testimony provided by the victim, at trial, that Appellant believes constituted perjury. PCRA Court Opinion, 7/18/22, at 16 (stating, Appellant "failed to provide evidence of perjured testimony"). Appellant baldly asserts that the Commonwealth "use[d] perjured testimony from the [victim.]" Appellant's Brief at 22. Therefore, we find the assertion involving perjured testimony to be waived.[11] *Commonwealth v. Taylor*, 277 A.3d

_____

Moreover, Appellant asserts that his due process rights were violated because the Commonwealth failed "to prove each element of the crimes charged beyond a reasonable doubt." Appellant's Brief at 22. We find that Appellant has waived a claim of insufficient evidence to support his conviction for failure to raise this claim before trial, at trial, or on direct appeal. 42 Pa.C.S.A. § 9544(b) (stating, "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal"); *see also* 42 Pa.C.S.A. § 9543(a)(3) (stating that, in order to be eligible for relieve under the PCRA, the allegation of error cannot be waived).

[11] Moreover, Appellant failed to raise this argument involving perjured testimony before the PCRA court. *See* Supplemental Amended PCRA Petition, 9/14/21, at ¶¶6-8 (setting forth allegations in support of his request for collateral relief without mention of perjured testimony). Appellant cannot

577, 591 (Pa. Super. 2022) (stating that, "[w]hen issues are not properly raised and developed in briefs, or when the briefs are wholly inadequate to present specific issues for review, [this] Court will not consider the merits thereof" and the issue is waived (citation and original quotation marks omitted)).

In his final issue, Appellant asserts that the PCRA court erred in dismissing his petition without granting him an evidentiary hearing. Appellant's Brief at 24.

It is well-established that a "a petitioner is not entitled to a PCRA hearing as a matter of right[. T]he PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact and the petitioner is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings." *Commonwealth v. Taylor*, 933 A.2d 1035, 1041 (Pa. Super. 2007), *appeal denied*, 951 A.2d 1163 (Pa. 2008); *see also* Pa.R.Crim.P. 907(1) (stating that, the PCRA court may dispose of a petition without a hearing when the PCRA court is "satisfied from [its] review that there are no genuine issues concerning any material fact and that the [petitioner] is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings"). Moreover, "PCRA hearings are not discovery expeditions; rather, they are conducted when necessary to offer

_____

raise a claim of perjured testimony for the first time on appeal. Pa.R.A.P. 302(a) (stating, "[i]ssues not raised in the [PCRA] court are waived and cannot be raised for the first time on appeal").

the petitioner an opportunity to prove that which he already [] asserted, and only when his proffer establishes a colorable claim about which there remains a material issue of fact." **Commonwealth v. Sneed**, 45 A.3d 1096, 1107 (Pa. 2012). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he[, or she,] raised a genuine issue of fact which, if resolved in his[, or her,] favor, would have entitled him[, or her,] to relief, or that the [PCRA] court otherwise abused its discretion in denying a hearing." **Id.** at 1106 (citation, original quotation marks, and brackets omitted).

For the reasons discussed herein, we find Appellant failed to establish a colorable claim about which there remained a material issue of fact. As such, we discern no error or abuse of discretion in the PCRA court's dismissal of Appellant's petition without an evidentiary hearing.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 7/13/2023*